**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:23-CR-209-03 (CKK)** |
| **NICHOLAS JOHN FULLER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Nicholas John Fuller to eleven months incarceration, three years supervised release, $2,000 restitution, and a $100 special assessment. The eleven-month incarceration recommendation is within the 8-to-14-month Guidelines range calculated by the government in this case.

## I.       INTRODUCTION

The defendant, Nicholas John Fuller, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Fuller, a 41-year-old road construction equipment operator from Minnesota, joined the mass of rioters resisting the police line on the Upper West Terrace, along with his older brother Kenneth Fuller and his nephew Caleb Fuller. By 3:30 p.m., Fuller and his family were at the forefront of a throng of rioters intent on confronting and resisting the ever-increasing police force assembled to clear the Capitol Grounds. At approximately 4:21 p.m., the police repeatedly ordered Fuller and other rioters to move back and began stepping towards the rioters while striking their riot shields on the ground.  Rather than comply, Fuller initiated physical contact with the police line, actively resisting their enforcement efforts for over a full minute.

The government recommends that the Court sentence Fuller to eleven months of incarceration for his conviction of violating 18 U.S.C. §§ 231(a)(3) and 2. An eleven-month sentence, which is in the middle of the advisory Guidelines' range, reflects the gravity of Fuller's conduct, but also acknowledges his early admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 61 ¶¶ 1-9, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.      Nicholas Fuller's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

Fuller's offense conduct during the January 6 attack on the Capitol were documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the Metropolitan and Montgomery County Police Departments, and open-source video.

Fuller traveled to Washington, D.C. from his home in Minnesota along with his co-defendant brother, Kenneth Fuller, and his co-defendant nephew, Caleb Fuller, arriving on January 5.[2] Fuller, admitted knowing the votes for the 2020 presidential election were being certified on January 6 and made what he described as a 'spontaneous' decision to go to D.C. Fuller said he was able to travel with his family because he had money to make the trip due to his stimulus checks. He attended the "Stop the Steal" rally with his brother and nephew and thereafter went to the U.S. Capitol after former President Trump told them to head down to a protest.  Fuller (and his family) chose to sightsee, including visiting the Lincoln Memorial, rather than head directly down to the Capitol so as to avoid the initial large crowd.  *See* Figure 1 below.

---

[2] On June 20, 2024, Fuller participated in an interview with the government, as required by his plea agreement and provided additional information to the FBI as described herein.  Fuller's participation in this interview and the information he provided is consistent with the evidence, suggesting that he has accepted responsibility consistent with the plea agreement.



*Figure 1 – Photo of Fuller's brother and nephew taken on January 6*

### **Upper West Stairs**

While heading to the Capitol, Fuller heard by word of mouth that people were inside of the Capitol.  When he arrived at the Capitol at approximately 3:30 p.m., Fuller walked up to where a police line had been established near the West Terrace area. Specifically, an increasing number of officers from various agencies (e.g., Arlington County Police Department, Metropolitan Police Department, Montgomery County Police Department) were assembling and working to clear the crowd from the North West stairs. Fuller spent the next fifty minutes within full view of the police line, alternately praying, chanting, and documenting with his phone his illegal presence inside the restricted area. *See* Figures 2, 2a and 3 below.

4



*Figure 2 – from Exhibit 1 Montgomery County Police Department ("MCPD") body worn camera ("BWC") recording screenshot at timestamp 00:41*



*Figure 2a – enlarged screenshot*



*Figure 3 – from Exhibit 2 MCPD BWC recording screenshot at timestamp 00:31 with Fuller circled in red and Kenneth Fuller circled in green*

At 4:16 p.m., Fuller was separated in proximity to the police line by at least one person. A nearby rioter said, "these big guys here are the strongest." Then, as one rioter stepped away from the police line, Fuller stepped closer. With his back and later his forearm, Fuller pressed against Officer J.M.'s riot shield jostling with the police officer for approximately twenty seconds in what would turn out to be a foreshadowing of his later conduct. *See* Figures 4 and 5.



*Figure 4 – from Exhibit 3 Arlington County PD BWC recording screenshot at timestamp 1:19*



*Figure 5 – from Exhibit 3 Arlington County PD BWC recording screenshot at 1:31*

By shortly before 4:22 p.m., Fuller and his family had moved closer to the Capitol and were positioned near a set of concrete stairs that led to the doors and windows of the Capitol. Fuller and the crowd stood opposite a line of law enforcement officers and at times, Fuller turned towards and appeared to address the nearby crowd of rioters with his hands and voice.  *See* Figure 6 below.



*Figure 6 – from Exhibit 4 open-source video screenshot at timestamp 1:16*

Body worn camera footage shows law enforcement repeatedly instructing the crowd, including Fuller, to move back.  In response, Fuller's brother Kenneth Fuller turned to the crowd behind him and yelled "Hey guys, they're getting ready to push!  They're getting ready to push guys!"  The police line then moved forward, using their shields to move the crowd down the stairs. As the officers moved forward with their shields, Fuller made physical contact with law enforcement.  He pushed against the officers' shields with his raised left elbow and forearm, before turning and leaning into the shields with his back, in an apparent attempt to prevent the forward

movement of the officers.  *See* Figures 7 through 9 below.



*Figure 7 – from Exhibit 3 Arlington County PD BWC recording screenshot at timestamp 6:33*



*Figure 8 – from Exhibit 3 Arlington County PD BWC recording screenshot at 7:29*



*Figure 9 – from Exhibit 4 open-source recording screenshot at timestamp 7:54 with Fuller circled in red and Caleb Fuller circled in yellow*

Fuller later admitted that even after being cleared off the stairs by the police, he returned to confront the police line on the Upper West Steps because he felt as though they were part of something important.[3]

### III.    THE CHARGES AND PLEA AGREEMENT

On March 13, 2024, a federal grand jury returned a superseding indictment charging Nicholas Fuller with four counts, including 18 U.S.C. §§ 231(a)(3) and 2 (Civil Disorder and

---

[3] Fuller participated in an interview with the FBI and the U.S. Attorney's Office on June 20, 2024 per the terms of his plea agreement. *See* Plea Agreement ¶ 2.

Aiding and Abetting).[4] On June 20, 2024, Fuller was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Fuller now faces sentencing on 18 U.S.C. §§ 231(a)(3) and 2. As noted by the plea agreement and the Presentence Report ("PSR") issued by the U.S. Probation Office, Fuller faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Guidelines analysis in the PSR is as follows:

---

[4] Count Two charged a violation of 18 U.S.C. § 1752(a)(1) for Entering and Remaining in a Restricted Building or Grounds.  Count Three charged a violation of 18 U.S.C. § 1752(a)(2) for Disorderly and Disruptive Conduct in a Restricted Building or Grounds.  Count Four charged a violation of 40 U.S.C. § 5104(e)(2)(D) for Disorderly Conduct in a Capitol Building.  Kenneth Fuller and Caleb Fuller were named as co-defendants in the same indictment and in each of the four counts contained therein.  They are scheduled to proceed to trial beginning January 14, 2025.

<u>Count One: 18 U.S.C. §§ 231(a)(3) and 2</u>

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Offense involved physical contact[5] | +3 |
| | **Total** | **13** |

| Acceptance of responsibility (U.S.S.G. §3E1.1(a)) | -2 |

| **Total Adjusted Offense Level:** | **11** |

*See* PSR ¶¶ 46-55.

The U.S. Probation Office calculated Fuller's criminal history as category I, which is not disputed. PSR ¶ 68. However, it underrepresents Fuller's past criminal offenses. Fuller has both juvenile and adult convictions as well as misdemeanor and felony convictions. Following three juvenile offenses involving theft and obstructing justice, Fuller was twice convicted as an 18-year-old when he gave a false name to a police officer, was driving after revocation, and committed theft. PSR ¶¶ 59-60. He did not successfully complete his term of unsupervised probation and his probation was revoked in June 2003. Fuller was convicted of DWI 2nd Degree in August 2002 and sentenced to 365 days imprisonment with all but 30 days suspended and 2 years supervised probation. PSR ¶ 61. Fuller violated his supervised probation and was revoked in July 2003 with the balance of his sentence imposed. *Id*. Fuller was next arrested and charged with Grand Theft of a Motor Vehicle and Giving a False Name in December 2002. PSR ¶62. At the time of his arrest, Fuller provided the name Kenneth W. Fuller. *Id*. He later pleaded guilty to Giving a False Name. *Id*. Fuller's adult felony convictions also include Auto Theft (2003) for which he was

---

[5] Section 2A2.4(b)(1) provides "If (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels." Subsections (A) and (B) are in the disjunctive. The government may prove one or the other; it need not prove both.

sentenced to 24 months imprisonment.  PSR ¶ 63.  In the same year, Fuller pleaded guilty to 2nd

Degree Controlled Substances and the court imposed a sentence of 58 months imprisonment.  PSR

¶ 64.  Fuller's next conviction likewise occurred in 2003 for Theft of a Motor Vehicle and 1st

Degree Damage to Property.  PSR ¶ 65. He was sentenced to 18 months and 15 months respectively

for these offenses.  *Id*.  In March 2009, Fuller was charged with Disorderly Conduct and

Obstruction of Legal Process – Interfere with Peace Officer.  PSR ¶ 66.  He pleaded guilty to

Disorderly Conduct and was sentenced to six months' probation and ordered to apologize in person

to the law enforcement officer. *Id*. Fuller's criminal history also includes traffic infractions and

one instance of his participation in a diversion program for public nuisances charges in 2016. PSR

¶¶ 69-78.

Section 4C1.1 does not apply in this case, because Fuller personally used violence when

he forcefully pushed with his body against the line of officers protecting the Capitol building.[6]

*See* U.S.S.G. § 4C1.1(a)(3) (providing that the adjustment for zero-point offenders only applies if

"the defendant did not use violence or credible threats of violence in connection with the offense").

As explained in this memorandum, Fuller (and his family) joined the mob and thrust his body into

the police line several times in attempt to force stave off the police officers' efforts and orders to

clear the Upper West Plaza. Using one's body to forcefully thrust into a police line with a collective

mass is plainly violent conduct.  *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No.

195 at 4-5 (holding that "violence" is defined as "[t]he use of physical force," typically

---

[6] The plea preserved the government's right to oppose application of the criteria for an adjustment under this section, § 4C1.1, including that the defendant used violence or credible threats of violence in connection with the offense. *See* Plea Agreement at ¶ 5(C).

"accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm" and "the "exert3ion of any physical force so as to injure or abuse."); *see also United States v. Hernandez,* No. 21-cr-445 (CKK), ECF No. 65 at 5 (same).

The government is aware of multiple cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, including in cases where the disqualifying conduct included pushing into police officers in the tunnel. *See e.g.*, *United States v. Giberson*, 23-cr-115 (CJN) (declining to apply the 4C1.1 adjustment, because the defendant's heave-ho pushes against officers in the tunnel constituted violent conduct, in a case involving a plea to 18 U.S.C. § 231(a)(3)); *United States v. Kepley*, 23-cr-162 (BAH) (declining to apply the 4C1.1 adjustment, because defendant's heave-ho pushes against officers in the tunnel constituted a "credible threat of violence" against those officers, in a case involving a misdemeanor plea to 18 U.S.C. § 1752(a)(1)); *see also, e.g., United States v. Grace*, 21-cr-138 (RBW); United States v. Case 1:23-cr-00138-RBW Document 140 Filed 02/20/24 Page 27 of 37 28 Bauer, No. 21-cr-386-2 (TNM); *United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB); *United States v. Fonticoba*, 21-cr-638 (TJK); *United States v. Dillard*, 23-cr-49 (JMC).

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the

government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[7]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 68. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 11, Fuller's Guidelines imprisonment range is 8 to 14 months' imprisonment. Fuller's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Fuller's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Fuller was an active participant in that riot.  He was at the center of the active resistance marshalled against the police line on the Upper West Steps. The collective nature of the rioters' attack – which both Fuller and his family repeatedly joined – imperiled the police officers, making it increasingly hard for them to defend the Capitol Building as they were

---

[7] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

continuously and gravely outnumbered. The nature and circumstances of Fuller's offense were of the utmost seriousness, and fully support the government's recommended sentence of eleven months imprisonment.

### B. Fuller's History and Characteristics

A lifelong resident of Minnesota, Fuller is a married, road construction equipment operator and father of six minor, school age children. PSR ¶¶ 86-87, 110. He has reportedly worked for his present employer since 2013.  PSR ¶ 110.  These aspects of his history are mitigating factors with respect to determining a reasonable and just sentence.

When put in context, Fuller's young family and the support he provides for them does not take his case out of the heartland of cases contemplated by the Guidelines for offenses such as his. He owns his home as well as several vehicles.  PSR ¶¶ 112-119.  His 401K account reflects a balance of over $20,000.  *Id*.  Both of his parents and his three siblings all reside in Minnesota. Fuller's wife works on a part-time basis and Fuller is the primary breadwinner in his family.  PSR ¶¶ 86, 112.  Imposition of a within Guidelines sentence would not leave his family bereft or destitute given the financial and familial resources available to his family. Nevertheless, he traveled to Washington, D.C. to commit these crimes leaving his family behind.  Fuller committed the crime because he chose to place his opposition to the government above all over concerns, including the law and his own family.  He cannot now rely on his family to avoid the natural consequences of his choices.

Fuller has a significant history of arrests and convictions which weighs in favor of a period of incarceration.  In addition to those convictions described *supra*, Fuller's criminal history also includes the following:

- In May 2002, the defendant was charged with Felony Theft and Criminal Damage to Property 3rd Degree.  PSR ¶ 74.  He was also charged with Underage Consumption and Underage Possession of Alcohol at the time of his arrest. This case was dismissed.

- In November 2002, the defendant was charged with False Information to Officer and DAR.  PSR ¶ 75.  This case dismissed.

- In January 2003, the defendant was charged with Receiving Stolen Property. Although the defendant admitted to purchasing known stolen property, the case was dismissed. PSR ¶ 76.

His admitted substance use involved daily use of methamphetamines dating back to the age of 16 and continuing until as recently as 2018.  PSR ¶ 100.  He has even tested positive for marijuana use while on Pretrial Supervision.  PSR ¶¶ 103-104. There is some indication Fuller's marijuana usage was encouraged by his diagnostic clinicians, who in 2023 diagnosed him with Generalized Anxiety Disorder and Major Depressive Disorder. PSR ¶¶ 96, 99.  That he would choose to use marijuana while subject to this court's oversight and without first seeking authorization speaks to his characteristic for noncompliance.

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a long series of felonious and misdemeanor offenses. Fuller's criminal history demonstrates he is well-acquainted with the law, but chose to disregard and disrespect the law.  *See* PSR ¶¶ 64, 66.  Fuller's choice to use violence happened after witnessing for almost an hour the assembly of scores of uniformed officers who had been summoned to clear the Capitol.  On January 6, Fuller's contempt for the law escalated when he callously and repeatedly confronted police trying to protect the Capitol, discounting on that afternoon any concern for his family responsibilities.  *See United States v. Dyce*, 91 F.3d 1462, 1466 (D.C. Cir. 1996) (noting that family ties and responsibilities … are not ordinarily relevant in determining

17

whether a sentence should be outside the applicable guideline range; departures on this basis permitted rarely and when family circumstances are "extraordinary").

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Fuller's criminal conduct on January 6 was the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.").

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. First, although Fuller has a criminal history category of I, his history of arrests and convictions shows a clear pattern of behavior that devalues

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

compliance with the law. *See* Section VI(B) *supra.* Second, although Fuller has now expressed remorse and contrition, his cursory assertion cannot undo his concerted actions on January 6. *See* PSR ¶ 44; *see also, United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). An objective analysis of Fuller's history and characteristics demonstrate that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence..

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

**F.      Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."

20

*United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Roger Baugh*, 22-cr-313 (JEB), Baugh was convicted by guilty plea of one count of civil disorder. Baugh attended the "Stop the Steal" rally and traveled to the Capitol with Mark Mazza, a friend whom Baugh knew was carrying a loaded firearm. Baugh and Mazza

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

walked to the West Front Terrace to a tunnel that led to a doorway inside the U.S. Capitol building. There, rioters were fighting with U.S. Capitol Police and D.C. Metropolitan Police Department Officers.  At approximately 3:12 p.m., Baugh entered the tunnel and assisted other rioters who were pushing against the officers who were resisting rioters trying to push through officers stationed at the first set of doors in the tunnel. He retreated from the tunnel at 3:14 p.m.  Like Fuller, Baugh - with a criminal history category of I and a total offense level of 11 - faced a recommended sentencing guidelines range of 8 to 14 months. The court imposed a within guidelines sentence of twelve months and one day.

In *United States v. Ronnie Presley*, 21-cr-257 (RDM), the defendant forcibly entered the U.S. Capitol and entered the Rotunda, where he stayed for approximately 20 minutes.  He resisted officers who were trying to remove him, and he also pled guilty to one count of 18 U.S.C. § 231(a)(3).  Presley was in criminal history category II; accordingly, although he had the same offense level as Fuller, he faced a guidelines range of 10 to 16 months' incarceration.  The Court sentenced Presley to 12 months imprisonment and 26 months supervised release.

In *United States v. David Alan Blair*, 21-cr-186 (CRC), Judge Cooper sentenced defendant Blair to 5 months' incarceration following a plea to a violation of 18 U.S.C. § 231(a)(3). On January 6, Blair was present on the West Lawn of the Capitol when members of a Metropolitan Police Department (MPD) civil disturbance unit (CDU), in order to clear the Lawn, began walking forward in a line from the West Terrace toward Blair and other rioters.  As the officers proceeded each of them loudly, clearly and repeatedly instructed the rioters to "move back." Consistent with their training, each officer held their baton laterally in front of them, one hand on each end, and thrust it forward and back as they advanced.  While most rioters complied, Blair, on the other hand,

immediately, loudly and blatantly refused to comply and actively encouraged others to join him. Blair intentionally positioned himself in front of one of the officers, deliberately drawing contact with the officer's baton.  Blair pushed his lacrosse stick into a police officer's chest area and was promptly detained and arrested.[11]

Like Blair, Fuller unmistakably heard the officers' orders to move back.  Also, like Blair, Fuller moved to the front of the crowd of rioters ensuring friction between the police and himself. Whereas Blair had one forceful push against the police lasting a few seconds, Fuller pushed against the police using his body weight twice and for well over a minute the second time.  In addition, Blair had no prior criminal history, either arrests or convictions.  The same cannot be said about Fuller.  The breadth of Fuller's criminal history and the length of time involved in his active resistance against the police line warrants a sentence above Blair's.

Taken together, these cases confirm that Courts have given defendants incarceration sentences for January 6th defendants who were involved in assaultive conduct.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[12] Generally, restitution under the VWPA must "be tied to the loss

---

[11] In the process of detaining Blair, police officers struck him with their batons about his body and head, causing physical injuries that required Blair's hospitalization.

[12] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Fuller must pay $2,000 in restitution, which reflects in part the role Fuller played in the riot on January 6.[13] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Fuller's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 149.

## VIII.   FINE

Fuller's convictions for violations of 18 U.S.C. §§ 231(a)(3) and 2 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose

---

covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[13] Unlike under the Sentencing Guidelines for which government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). The guideline fine range is from $4,000 to $40,000. USSG §5E1.2(c)(3). Here, Fuller's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine in addition to restitution. PSR ¶ 125.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of eleven months incarceration, three years supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:

*/s/ Cytheria D. Jernigan*
CYTHERIA D. JERNIGAN
DC Bar No. 494742
Assistant United States Attorney
Detailed to the District of Columbia
601 D Street N.W.
Washington, D.C. 20001
(318) 676-3611
cytheria.jernigan@usdoj.gov